**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| RURAL WATER DISTRICT NO. 5 | ) | |
| WAGONER COUNTY, OKLAHOMA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 08-CV-252-JED-FHM |
| | ) | |
| v. | ) | |
| | ) | |
| CITY OF COWETA; COWETA | ) | |
| PUBLIC WORKS AUTHORITY. | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Plaintiff, Rural Water District No. 5 of Wagoner County, Oklahoma (Wagoner-5), filed this case claiming that, as a debtor association under 7 U.S.C. § 1926(b), it has the exclusive right to provide water service to all customers within its service area. Wagoner-5 was indebted from 1970 to 2001, and it became re-indebted under § 1926(b) upon acquiring a loan from the United States Department of Agriculture (USDA) on June 15, 2007. The case involves Wagoner-5's claim to the exclusive right to provide water service to four locations: Koweta Indian Clinic; Timber Ridge Crossing Subdivision; Celebration at the Woods Subdivision; and Cedar Creek Village (the "Disputed Customers"). After Wagoner-5 became indebted on the June 15, 2007 loan, the defendants, City of Coweta and the Coweta Public Works Authority (collectively, Coweta) provided household water service to the Disputed Customers. Wagoner-5 initiated this suit for damages and equitable relief under 42 U.S.C. § 1983 and 7 U.S.C. § 1926(b).

The Court previously conducted a jury trial on Wagoner-5's damages claims. The jury returned a verdict upon special interrogatories in favor of Wagoner-5, establishing that Wagoner-5 made potable water service available to each of the four Disputed Customers. (Doc. 121 at 1-

4). The jury further determined that Coweta had not established that the cost to any Disputed Customer to obtain potable water service from Wagoner-5 was "unreasonable, excessive, and confiscatory." (*Id.*).  Because the other elements of the § 1926(b) claim were established by the parties' pretrial stipulations (*see* Doc. 107 at 6, ¶ III), the jury's findings resulted in a victory for Wagoner-5.  The jury found that Wagoner-5 incurred a total of $614,798 in damages due to Coweta providing potable water service to the Disputed Customers. (Doc. 121).

Apart from the damages found by the jury, Wagoner-5 also sought equitable relief in several forms:

(1)     a declaratory judgment to establish the rights and other legal relations of the parties concerning the right of Coweta to sell water to the Disputed Customers;

(2)     an injunction enjoining Coweta from competing with Wagoner-5 in relation to the Disputed Customers and  compelling Coweta to transfer water service of the Disputed Customers to Wagoner-5; and

(3)     the imposition of a constructive trust over any and all water lines and facilities owned by Coweta and utilized to serve the three Residential Projects: Cedar Creek Village; Celebration at the Woods; and Timber Ridge Crossing.

(Doc. 2 at 5-6; Doc. 107 at 2-4).  Following the jury's verdict, the Court heard evidence on Wagoner-5's equitable claims at a bench trial, in order to determine what appropriate equitable relief, if any, should be granted to Wagoner-5.  During the equitable bench trial, and with the parties' agreement, the Court considered the evidence presented during the jury trial and heard additional testimony.  Upon consideration of all testimony, exhibits, and briefing by counsel, the Court enters the following findings of fact and conclusions of law.

## FINDINGS OF FACT [1]

1.      Wagoner-5 was formed according to state law requirements and is an "association" within the meaning of 7 U.S.C. § 1926(b). (*See* Doc. 107 at 6).

2.      The Disputed Customers are all located within the territory of Wagoner-5, which was incorporated on May 23, 1966. (Doc. 52-1; *see also* 49-2, 49-3, 49-4, 49-5).

3.      As found by the jury, Wagoner-5 made potable water service available to each of the Disputed Customers. (Doc. 121).

4.      Wagoner-5 is indebted to the USDA for the purpose of 7 U.S.C. § 1926(b). (Doc. 107 at 6).  Wagoner-5 was indebted to the USDA from September 28, 1970 until November 28, 2001.  (PX 22 at 3-11).  Wagoner-5 became re-indebted to the USDA on June 15, 2007. (PX 22 at 17).  Wagoner-5 has remained indebted to the USDA since June 15, 2007. (PX 22 at 2, 17).

5.      Coweta currently provides water service to the Disputed Customers. (Doc. 107 at 6).  Coweta first began providing contractor water service to Timber Ridge Crossing in June 2005; to Koweta Health Clinic on March 20, 2006; to Cedar Creek Village on May 12, 2009; and to Celebration at the Woods on October 28, 2009. (DX 22).  Coweta first began providing customer water service to Timber Ridge Crossing on October 14, 2005; to Koweta Health Clinic on May 16, 2006; to Celebration at the Woods on July 23, 2010; and to Cedar Creek Village on December 28, 2009. *Id*.

6.      The Koweta Health Clinic was an existing water customer of Wagoner-5 before Coweta commenced water service to the Clinic. (Doc. 129 at 54, ll. 23-25; at 55, ll. 1-13).

---

[1]      Any findings of fact that are conclusions of law shall be construed accordingly, and any conclusions of law that are findings of fact shall be construed accordingly.

7.      The on-site water lines and facilities associated with the three Residential Projects were conveyed to Coweta by each of the developers on the following dates: Timber Ridge Crossing on June 6, 2005 (PX. 308); Celebration at the Woods on May 4, 2009 (PX. 309); and Cedar Creek Village on July 6, 2009 (PX. 310).  Coweta did not pay for any of the on-site water facilities that were conveyed to it.  (Doc. 141 at 95, ll. 7-9; at 96, ll. 2-8; at 97, ll. 17-25 to 98, l. 1).  No on-site water lines were conveyed to Coweta for the Koweta Health Clinic.

8.      Coweta violated Wagoner-5's rights to § 1926(b) protection during Wagoner-5's original period of indebtedness to the USDA.  During the bench trial, Phil Roland testified that, in the 1980s, he was the developer of two other Timber Ridge developments situated north of Timber Ridge Crossing. (Doc. 141 at 17, ll. 5-8).  Mr. Roland constructed water lines to connect these two other developments to the Coweta water system and then dedicated the lines to Coweta, because, "[i]n [his] mind, you have to have water to have sewer." (*Id.* at 20, l. 19; at 21-22).  Roland paid for these water lines with some reimbursement from Coweta for excess capacity. (*Id.* at 22, ll. 11-18).  Mr. Roland testified that Wagoner-5 had water lines on these two developments at the time (Doc. 141 at 19, ll. 5-8), but no one from Coweta informed him that the water district had a right to provide water service in that area. (Doc. 141 at 29, ll. 11-14).

9.      Coweta pressured developers to use its water service by tying its water service to its sewer service.  Mike Yochum, the developer of Celebration at the Woods, was advised by his engineer that if he "had to have the city [sewer] service, that [he] had to get the water from the City of Coweta." (Doc. 130 at 238, ll. 4-8).  Eddie Reynolds, the developer of Cedar Creek Village, similarly testified that Coweta would not provide sewer service to his development unless he also agreed to accept water service from Coweta. (Doc. 130 at 216, ll. 9-19; *id.* at 217-218).  At the time he was planning the development, Reynolds wanted to utilize city sewer

service so that he could develop a greater number of lots of smaller lot size.  However, the

Coweta City Manager, Steven Whitlock, told Reynolds that Coweta would not provide sewer

service to the development if Wagoner-5 provided water service:

> Q.   Did you tell [Whitlock] that you had already approached the water district and that there's water district pipes of adequate size right on the property?
>
> A.   Yeah.  I mean, I mentioned, yeah, we've got water there, you know, isn't there any way we can use it.  And they said, no, you can't use it if we're wanting city sewer.
>
> Q.   That was the only catch?
>
> A.   Yeah, we just had to do it that way.  We couldn't get city sewer if we wasn't [sic] annexed and we couldn't get city sewer if we didn't use city water.

(*Id.* at 217, ll. 1-10).

Whitlock told Reynolds that it was "just [Coweta's] policy" that a developer must use

city water in order to obtain city sewer.  (*Id.* at 216, ll. 11-19).  Reynolds further testified that he

would not have had to run lines outside of the subdivision if he had hooked up to Wagoner-5's

lines, which were already in place to the edge of the subdivision.  (*Id.* at 215).  In contrast,

because Coweta required that he use city water service, Reynolds had to run off-site line to the

city's water lines about one-quarter of a mile away.  As a result, the development of the Cedar

Creek Village subdivision cost Reynolds an extra $35,000 to $40,000 more than it would have if

the subdivision had utilized Wagoner-5 water service.  (*Id.* at 217-218).[2]

---

[2]   At the bench trial, Whitlock denied that Coweta has a policy requiring developers to use city water to obtain city sewer and denied that he told Reynolds that Cedar Creek Village must use city water to use city sewer. (Doc. 141 at 113, ll. 5-17).  However, and despite being endorsed as the first witness on the City's witness list for the jury trial (Doc. 107 at 48), Whitlock did not testify during the jury trial to counter Reynolds's testimony.  (Doc. 141 at 115, ll. 5-25 to 116, ll.1-11).  When asked why he waited until the bench trial to dispute Reynolds's jury trial testimony, Whitlock responded "I don't know.  I just didn't." (Doc. 141 at 116, ll. 7-11).  Based upon the Court's view of those witnesses' demeanor and testimony, the Court finds Mr. Reynolds's testimony to be significantly more credible on this issue.

10.     Coweta knew of the protections afforded to Wagoner-5 under § 1926(b) years before beginning to provide water service to any of the Disputed Customers. There is evidence that Wagoner-5 and Coweta were previously embroiled in a similar dispute that resulted in a judgment entered on a settlement agreement in 1998 ("the Settlement Agreement"). (PX. 34). The Settlement Agreement allowed Coweta to provide water service to certain customers within Wagoner-5's territory, with consideration paid to Wagoner-5 for that right. (PX. 34 at 4-7). The term of that Settlement Agreement was five (5) years. (PX. 34 at 4). Due to that earlier dispute, Coweta was put on notice of the relevant law, 7 U.S.C. § 1926(b), which protects a water association from competition if it is indebted to the federal government and has "provided or made available service to the disputed area." *See Sequoyah Cnty. Rural Water Dist. No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1197 (10th Cir. 1999).

11.     Even if the previous dispute had not alerted Coweta to the protections afforded to Wagoner-5 under § 1926(b), the Manager of Wagoner-5, Arvil Morgan, met with Coweta officials around 2005 or 2006 to urge Coweta to stop competing with Wagoner-5—specifically in relation to the Koweta Health Clinic and Timber Ridge Crossing.[3] (Doc. 130 at 138, ll. 3-11). Mr. Morgan testified that Coweta City Manager Whitlock responded negatively to his plea:

> And I asked him, I said, you can take our whole district, just leave our water alone.  And we would put all—whatever their fees are, we'd put them on our bill and bill for them and give them a check once a month.
>
> And that's when he—he raised up and looked across at me and said, "We want it all." So I thought, I don't know how to deal with something like that. You can't make a deal with people like that. So here we are.

---

[3]   Mr. Morgan testified that the meeting occurred "maybe in 2005, somewhere in that area," but he subsequently suggested that Coweta had already begun serving Koweta Health Clinic at the time of the meeting (Doc. 130 at 136, ll. 15-18; *id.* at 138, ll. 5-7).  Thus, the meeting may have actually occurred in 2006.

(Doc. 130 at 140, ll. 24-25; at 141, ll. 1-6; *see also* Doc. 141 at 43, ll. 16-23; Doc. 131 at 397 [another meeting attendee, Frank Hollingshed, testified that Whitlock said "we want it all."]). Whitlock did not testify at the jury trial to dispute Morgan's testimony regarding the meeting.

Consistent with his testimony during the jury trial, Morgan again testified at the bench trial that Whitlock demanded that Coweta have "it all."   (*See* Doc. 141 at 43, ll. 16-23). Whitlock testified at the bench trial, but made no effort to counter Morgan's testimony – from either the jury trial or the bench trial – regarding the meeting. (*See* Doc. 141 at 115, ll. 5-11; *id.* at 93-119). Thus, Mr. Morgan's account of what occurred during the meeting stands unrefuted.

Though the meeting apparently occurred before Wagoner-5 was re-indebted to the USDA in 2007, it shows that Coweta had reason to know of Wagoner-5's potential claim to the right to provide water service to at least two of the Disputed Customers, the Koweta Health Clinic and Timber Ridge Crossing, at upon its re-indebtedness.  Long before then, the Tenth Circuit had determined that a rural water district "may recover for encroachments occurring or **continuing** after . . . the date on which [the rural water district] obtained another loan, so long as it establishes that it made service available to those customers. . . ." *Sequoyah-7*, 191 F.3d at 1206 (emphasis added).  After Wagoner-5 became indebted again in June 2007, Coweta intentionally disregarded Wagoner-5's right to serve those customers.

12.    Following Wagoner-5's re-indebtedness as of June 15, 2007, it also advised Coweta of Wagoner-5's § 1926(b) rights to serve two of the Disputed Customers – Celebration at the Woods and Cedar Creek Village – *before* Coweta accepted conveyance of the on-site water facilities for those subdivisions (*see* PX 309, 310; Doc. 141 at 95, 97) and *before* Coweta commenced water service in those locations.  Coweta's customer water service commenced at Cedar Creek Village on December 28, 2009, and at Celebration at the Woods on July 23, 2010.

(FOF ¶ 5). On July 18, 2007, Wagoner-5's attorney warned Coweta that Wagoner-5, as a rural water district indebted to the USDA, enjoyed the protection of § 1926(b). (PX 32). That letter was sent over two years prior to Coweta's commencement of water service to Cedar Creek Village and three years prior to its initiation of service at Celebration at the Woods.

13.     After the jury returned its verdict, Mr. Whitlock wrote a letter to the Oklahoma Department of Environmental Quality (ODEQ) to express purported concerns about Wagoner-5's water system, specifically regarding backup power, storage, and water pressure, in an apparent effort to have the ODEQ take some action against Wagoner-5 or to otherwise interfere with its efforts to prepare to commence water service to the Disputed Customers. (*See* Doc. 141 at 99, ll. 2-12; at 45, ll. 21-25; at 46, ll. 1-4). Whitlock testified that the purpose of contacting the ODEQ after the jury trial was to prompt an investigation of Wagoner-5's "service levels" based on the testimony of Mike Kyser, who was Coweta's expert witness during the jury trial and whose report was prepared in connection with his trial testimony. (*Id.* at 100-101). Whitlock admitted that, although Mr. Kyser's expert report had been prepared approximately a year before, he did not write his letter to the ODEQ – about the purported concerns expressed in that report – until *after* the jury returned the verdict against Coweta. (*Id.* at 101, l. 25 to 102, ll. 1-8; *see* Doc. 107 at 40 [Kyser's reports were dated between August 2012 and January 2013]).

At a meeting with ODEQ representatives, Coweta officials also provided the ODEQ with a copy of the Kyser report. (Doc. 141 at 106, ll. 16-21). Yet, Whitlock did not provide the ODEQ with a copy of the jury's verdict against Coweta, nor did he advise the ODEQ of the contrary opinions of Wagoner-5's expert which had been presented during the jury trial:

THE COURT:

Q.     Did you provide a copy of the jury's verdict against Coweta to ODEQ?

A.    No.

Q.    Did you provide it by way of your letter?

A.    No.

Q.    Did you provide it by way of the meeting?

A.    No. . . .

Q.    Did you inform the ODEQ of testimony contrary to Mr. Kyser's?

A.    I don't believe so.

(*Id.* at 107-109).

Coweta also did not notify Wagoner-5 of Whitlock's contacts with ODEQ.  Whitlock did not provide plaintiff's counsel with a copy of the letter to the ODEQ.  (*Id.* at 107, ll. 9-12).  And, although the purpose of Whitlock's contact with ODEQ was to identify purported concerns about the transfer of service to Wagoner-5, Whitlock also did not invite Wagoner-5 to attend the meeting with the ODEQ:

Q.    And so why were you making these inquiries regarding the needs of the rural water district – let me back up for a second.  Did you invite any representative of the rural water district to participate in these meetings?

A.    No.

Q.    Why not?

A.    Why would we?

Q.    Well, you were there talking about the possibility of transfer of service from the City to the water district.  It would seem logical to have them present if that was the topic of discussion.  But you didn't invite them there; right?

A.    Correct.

(*Id.* at 105, ll. 8-19).

## CONCLUSIONS OF LAW

**I.     Coweta violated 7 U.S.C. § 1926(b) in relation to all four Disputed Customers.**

Section 1926(b) is the anti-curtailment provision of a statute authorizing the Secretary of the USDA to make water and waste facility loans and grants to certain entities. 7 U.S.C. § 1926(b).  The statute provides the following protection to the indebted entities:

> The service provided or made available through any such association shall not be curtailed or limited by inclusion of the area served by such association within the boundaries of any municipal corporation or other public body, or by the granting of any private franchise for similar service within such area during the term of such loan; nor shall the happening of any such event be the basis of requiring such association to secure any franchise, license, or permit as a condition to continuing to serve the area served by the association at the time of the occurrence of such event.

*Id.* To be entitled to protection against competition under this provision, a rural water district "must establish 1) its continuing indebtedness on loans obtained from the USDA and 2) that it has provided or at least made water service available." *Rural Water Sewer & Solid Waste Mgmt., Dist. No. 1, Logan Cnty., Okla. v. City of Guthrie*, 654 F.3d 1058, 1062 (10th Cir. 2011).

Given the jury's determination that Wagoner-5 made potable water service available to Celebration at the Woods and Cedar Creek Village customers (*see* Findings of Fact (FOF) ¶ 3 above) and the fact that Coweta provided such service only after Wagoner-5 became indebted to the USDA (*see* FOF ¶¶ 4-5, 12 above), Coweta's § 1926(b) violations regarding those two Residential Developments are clear.  In addition, although Coweta had already commenced water service to the Koweta Health Clinic and Timber Ridge Crossing prior to Wagoner-5's June 15, 2007, USDA loan, Coweta's continued potable water service to these customers after being notified of the USDA loan was also a violation of Wagoner-5's rights under § 1926(b). The Tenth Circuit has held that an indebted association may regain § 1926(b) protection in regard to customers that a competitor began serving prior to the date of the association's USDA

indebtedness. *See Sequoyah-7*, 191 F.3d at 1201, 1206; *Pittsburg Cnty. Rural Water Dist. No. 7 v. City of McAlester*, 358 F.3d 694, 712-13 (10th Cir. 2004).

This Court recognized and followed the "continued service" rule as established by the Tenth Circuit in its ruling on summary judgment in this case, noting in pertinent part:

> The Tenth Circuit has held that a rural water district may maintain claims against a municipality for curtailment after the district become indebted, even where the municipality began providing services to disputed properties prior to the district's indebtedness. *See Sequoyah County Rural Water District No. 7 v. Town of Muldrow*, 191 F.3d 1192, 1201-06 (10th Cir. 1999); *Pittsburg County Rural Water District No. 7 v. McAlester*, 358 F.3d 694, 712 (10th Cir. 2004). . . .
>
> A plain reading of those decisions reveals a thorough analysis of the facts, applicable law, and policies underlying § 1926(b). The reasoning of the Tenth Circuit on the issue is also consistent with the overarching standard applied in the Tenth Circuit to § 1926(b) claims: "Any 'doubts about whether a water association is entitled to protection from competition under § 1926(b) should be resolved in favor of the . . . indebted party seeking protection for its territory.'" *Logan-1*, 654 F.3d at 1062-63 (citations omitted).

(Doc. 90 at 13, 15).

Because Coweta violated Wagoner-5's § 1926(b) rights, the Court will next determine what, if any, equitable remedies should be awarded.

## II.    Injunctive relief is appropriate

Section 1926(b) does not provide for a particular remedy. *See North Alamo Water Supply Corp. v. City of San Juan, Tex.*, 90 F.3d 910, 917 (5th Cir. 1996); 7 U.S.C. § 1926(b).  Among other things, Wagoner-5 seeks declaratory and injunctive relief.  Specifically, Wagoner-5 asks that "the Court declare the rights and other legal relations of the parties concerning the right of Coweta to sell water to the 'Disputed Customers'" and enter an injunction prohibiting Coweta from engaging in further conduct with respect to the Disputed Customers in violation of § 1926(b).  (Doc. 2 at 5-6; *see* Doc. 143 at 20).  "For a party to obtain a permanent injunction, it must prove: (1) actual success on the merits; (2) irreparable harm unless the injunction is issued;

(3) the threatened injury outweighs the harm that the injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Southwest Stainless v. Sappington*, 582 F.3d 1176, 1191 (10th Cir. 2009) (quoting *Prairie Band Potawatomi Nation v. Wagnon,* 476 F.3d 818, 822 (10th Cir. 2007)).

Wagoner-5 has succeeded on the merits.  It prevailed on all issues before the jury as to the Disputed Customers, and damages were properly assessed by the jury.  As noted above, the Court has found and concluded that, commencing on June 15, 2007, Wagoner-5 was protected by 7 U.S.C. § 1926(b), and that Coweta's potable water service to the Disputed Customers curtailed or limited potable water service, which the jury found Wagoner-5 had made available to those customers.  Thus, Wagoner-5 has established both its claim for § 1926(b) protection (for so long as it remains indebted to the USDA) and entitlement to the past damages awarded by the jury's verdict.  This amounts to complete success on the merits of its § 1926(b) claim.

If Coweta is not enjoined from providing water service to the Disputed Customers, there is a significant risk of harm to Wagoner-5 that cannot adequately be cured by monetary damages. For as long as Wagoner-5 remains federally indebted, a new violation of § 1926(b) would occur in the future every time Coweta would provide potable water service to a Disputed Customer, which would potentially require Wagoner-5 to file multiple lawsuits to obtain monetary damages caused by such service.  Wagoner-5's accounting expert testified that an economic loss of approximately $6400 per month would be suffered if Coweta were to continue to provide service to the Disputed Customers. (Doc. 141 at 30-33).  That amount would vary depending on the number of residences and volume of water supplied.  Thus future damages are not reasonably capable of calculation.  Numerous courts have found that injunctive relief is one way of remediating and preventing future damage from a § 1926(b) violation.  *See, e.g., North Alamo*,

90 F.3d at 917; *Rural Water, Sewer, and Solid Waste Mgmt. District No. 1, Logan County v. City of Guthrie*, CIV-05-786-M, 2016 WL 126877 at **2-3 (W.D. Okla. Jan. 11, 2016) (unpublished).

The threatened injury in allowing future violations of § 1926(b) with respect to the Disputed Customers outweighs any harm that the injunction may cause Coweta. Indeed, the injunction will cause Coweta no harm in that it is merely prohibiting conduct which has been found to violate § 1926(b). In addition, the issuance of an injunction will not adversely affect the public interest. According to the testimony at trial, if Wagoner-5 were to lose customers or potential customers, the cost of its service would necessarily be spread among fewer customers and its cost to the remaining customers would thus increase. The purpose of § 1926(b) is to keep costs lower for rural water customers. *See Rural Water Dist. No. 1, Ellsworth County, Kan. v. City of Wilson, Kan.*, 243 F.3d 1263, 1270 (10th Cir. 2001) (discussing legislative history reflective of a concern with costs).

The Court accordingly determines that it is legally appropriate to enter an injunction preventing Coweta from continued or new violations of Wagoner-5's rights under § 1926(b) as to the Disputed Customers. Such an injunction is set forth in the Conclusion of this order. Additionally, in light of the fact that Coweta has continued to provide potable water service to the Disputed Customers, a transfer of service from Coweta to Wagoner-5 will be required in order to effectuate the purposes of § 1926(b) and the Court's injunction. The parties previously entered into written stipulations regarding potable water service pending the final conclusion of this action. Through their stipulations, the parties agreed that:

> Coweta shall retain ownership and control over the on-site facilities, and shall continue to provide potable water service to all existing customers within the Four Properties, as well as new customers / new applicants for water service, within the Four Properties, until such time as a final Order and Judgment is entered herein.

If transition of water service is ordered by the Court in any final Order and Judgment, *such interim service as described in this Order shall continue, unless otherwise ordered by the Court, until such time as Wagoner-5 has completed the necessary connection to the on-site facilities in order to connect the customers to Wagoner-5's potable water transmission facilities based upon the method of service the Court may require in its final Order and Judgment.* Coweta shall be entitled to receive and retain all the revenue it normally and customarily charges and receives for providing existing water service to existing customers within the Four Properties and for new service within the Four Properties (including but not limited to tap fees, meter fees, etc.) charged or collected during the pendency of this order, and Coweta shall be solely responsible for maintenance and repairs of the on-site facilities during this period.  Wagoner-5 shall not claim against nor have any right to the said revenue described herein.

(Doc. 151 at 2-3).  The parties agreed to the foregoing interim service terms to apply to any ordered transfer of service "unless otherwise ordered by the Court."  (*Id.*).  These terms are reasonable and will be ordered to continue in effect until Wagoner-5 has its water system connected to the Disputed Customers.

**III.  The imposition of a constructive trust is appropriate in this case.**

There are few cases dealing with the equitable phase of a § 1926(b) case and whether the party in violation of the statute is required to transfer on-site facilities to the protected party. In certain circumstances, a court may impose a constructive trust:

The primary reason for imposing a constructive trust is to avoid unjust enrichment. It is imposed against one who "by fraud, actual or constructive, by devices or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good conscience, either obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy" . . . [A]n element of unfairness in allowing the legal title holder to retain the property is not sufficient to justify the imposition of a constructive trust. There must also be some active wrongdoing on the part of the person against whom recovery is sought . . . .

A mere preponderance of the evidence is not sufficient to establish a constructive trust but it must be established by evidence which is clear, definite, unequivocal and satisfactory, or such as to leave but one conclusion, or as to leave no reasonable doubt as to the existence of the trust.  The rationale behind such a strict standard of proof is to protect the security of titles. . . .

> The cancellation of a deed is an exertion of the most extraordinary power of a court of equity. The power ought not be exercised except in a clear and exceptional case.

*Easterling v. Ferris*, 1982 OK 99, ¶¶ 10-11, 16, 651 P.2d 677, 680-82 (citations omitted), cited in *Glenpool Utility Serv. Auth. v. Creek Cnty. Rural Water Dist. No. 2*, No. 91-5047, 1992 WL 37327, at *3 (10th Cir. Feb. 25, 1992).

*Glenpool Utility* involved a rural water district adjudicated to have the exclusive right under § 1926(b) to provide water service to a certain area. 1992 WL 37327, at *1. Although finding it a "close question," the *Glenpool* court held that the evidence of wrongdoing by the City of Glenpool was not sufficient to impose a constructive trust. *Id.* at *3. In doing so, the court in *Glenpool* relied on the fact that the City of Glenpool itself was also indebted to the Farmers Home Administration (predecessor to the U.S. Department of Agriculture), giving City officials a reason to believe they could provide water service to the disputed area. *Id.* The *Glenpool* court also noted there was "insufficient evidence in the record to enable us to conclude that Glenpool actively sought out and encouraged the developer to construct the water lines and dedicate them to Glenpool," suggesting that such active encouragement may have justified imposing a constructive trust. *See id.*

Here, Coweta was not indebted to the USDA (Doc. 141 at 98, ll. 14-21), so Coweta had no reason to believe that it had the legal right or duty to provide potable water service to the Disputed Customers within Wagoner-5's territory after June 15, 2007. In fact, Coweta officials knew, particularly with respect to Cedar Creek Village and Celebration at the Woods, that Wagoner-5 claimed an exclusive right to serve those customers. (*See* FOF ¶ 12). The Manager of Wagoner-5 met with Coweta officials in person over this issue in 2005 or 2006, Wagoner-5's

attorney sent Coweta officials a letter on the subject after the USDA loan in 2007, and the two parties had been involved in a § 1926(b) dispute almost a decade before that.

As noted, Coweta did not pay for any of the on-site water facilities that were deeded to it on the three subdivisions. (FOF, ¶ 7). Unlike the municipality involved in *Glenpool*, Coweta obtained possession of the facilities at least in part by tying its water service to its sewer service. (*See* FOF ¶ 9 *supra*). And, had Coweta not done so, the on-site facilities of at least Cedar Creek Village and Celebration at the Woods would most likely have been initially deeded to Wagoner-5 instead of Coweta. (*See* PX 309, 310; *see also* Doc. 130 at 122-123, 212-215 [developers are responsible for costs of placing all on-site lines in the ground with provider of water service subsequently having responsibility for maintenance of those lines]). Coweta's strategy put pressure on developers to use Coweta's water service, even if the property in question was located within Wagoner-5's territory. Questionable behavior on the part of Coweta continued even beyond the trial, as the evidence showed that Coweta attempted to at least thwart any transfer of facilities to Wagoner-5 by instigating an ODEQ investigation of Wagoner-5. (*See* FOF ¶ 13 *supra*).

For these reasons and upon evidence that the Court has determined to be clear, definite, unequivocal and satisfactory, it is equitable to impose a constructive trust on the on-site infrastructure utilized to deliver water from Coweta's main lines at the edges of the Disputed Customers' territories, including but not limited to all pipes and meters, as well as the right to utilize all easements and right of ways utilized for such facilities. No forfeiture is necessary relative to the Koweta Health Clinic, as the water lines on that property are owned by the Clinic and would be used to connect to Wagoner-5's existing facilities to transfer potable water services from Coweta to Wagoner-5.

**IV.     The provision of fire protection to the Disputed Customers is left to the parties.**

The question of fire protection raises many serious concerns—most importantly among them, public safety. Precedent cases, however, are clear that the § 1926(b) anti-curtailment provision relates only to the supply of household water.  A water association, such as Wagoner-5, may be protected from competition regardless of its ability to provide fire services. *Sequoyah-7*, 191 F.3d at n.10 (referencing *Rural Water Dist. No. 3 v. Owasso Utils. Auth.*, 530 F. Supp. 818, 823 (N.D. Okla. 1979)).[4]  Moreover, the Oklahoma Supreme Court has determined that "the right of an indebted association to supply water service within its service area under section 1926(b) coexists with a municipality's right to provide fire protection." *Rural Water Sewer and Solid Waste Mgmt., Dist. No. 1, Logan Cnty., Okla. v. City of Guthrie*, 2010 OK 51, ¶ 26, 253 P.3d 38, 49.

Wagoner-5, in its Proposed Findings of Fact and Conclusions of Law, described three possible arrangements to provide for fire protection. (Doc. 161-1 at 4-5). The Court believes these alternatives to be a strong starting point for discussions between the parties as to how the Disputed Customers will receive uninterrupted fire protection notwithstanding the transfer of potable water service and the relevant on-site infrastructure to Wagoner-5. As the *Glenpool* court expressed, "[s]urely there is incentive for these two nonprofit public bodies to work out a solution that would not require [a party] to build duplicate lines."  1992 WL 37327 at *4.  This Court is similarly confident that Coweta and Wagoner-5 can come to an agreement on this issue, keeping the residents' interests in the forefront and ensuring that residents are provided fire protection.

---

[4]  Federal and Oklahoma law do not require rural water districts to provide fire protection to their customers. *Rural Water, Sewer and Solid Waste Mgmt. Dist. No. 1, Logan Cnty., Okla. v. City of Guthrie*, No. CIV-05-786-R, 2007 U.S. Dist. LEXIS 102713, at *25 (W.D. Okla. Sept. 27, 2007), *aff'd in part, Logan-1 v. City of Guthrie*, 654 F.3d 1058, 1066 (10th Cir. 2011).

## V.     Prejudgment interest is appropriately awarded

"Prejudgment interest is not recoverable as a matter of right." *Greene v. Safeway Stores, Inc.*, 210 F.3d 1237, 1247 (10th Cir. 2000).  However, "under federal law prejudgment interest is ordinarily awarded, absent some justification for withholding it." *Kleier Advert, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1042 (10th Cir. 1990).   And the Tenth Circuit "has adopted a preference, if not a presumption, for prejudgment interest" in the context of federal claims. *United Phosphorus, Ltd. v. Midland Fumigant, Inc.*, 205 F.3d 1219, 1236 (10th Cir. 2000).   In determining whether to apply prejudgment interest to a damages award under federal law, the trial court must "focus on a two-step analysis: (1) whether an award of prejudgment interest would serve to compensate [the winning party]; and (2) if so, whether equity precludes an award." *Id.* at 1237.

In this case, prejudgment interest would in fact serve as compensation for Wagoner-5. "Prejudgment interest compensates the injured party for the loss of the use of money he would otherwise have had." *Frank Music Corp. v. Metro-Goldwyn-Mayer Inc.*, 886 F.2d 1545, 1550 (9th Cir. 1989), quoted in *Kleier Advertising, Inc. v. Premier Pontiac, Inc.*, 921 F.2d 1036, 1041 (10th Cir. 1990). In the first phase of this case, a jury determined plaintiff's damages to be $614,798. (Doc. 121).

In this case, the damages amount would not fully compensate Wagoner-5 for its loss of the use of the money it otherwise would have earned from the Disputed Customers.  The jury instructions did not direct the jury to include any interest in its determination of any damages. (Doc.120 at 17).   And the $614,798 awarded by the jury derived directly from the expert testimony of Ron Creason, who testified during the jury trial that $614,798 was the net revenue loss suffered by Wagoner-5 as a result of Coweta's violation of § 1926(b). Mr. Creason did not

testify to having included any calculation of interest in determining this net revenue loss. (Doc. 131 at 364-367).

Moreover, the Court finds no reason that equity should preclude prejudgment interest in this case. Wagoner-5 has acted cooperatively with Coweta since the jury trial phase, allowing Coweta to continue to earn revenue from the Disputed Customers until this Court issued a final judgment. (Doc. 151 at 2-3). Though the parties' interim agreement waived any claim by the Plaintiff for "*additional damages* . . . based on Coweta providing *continued water service* to existing customers or service to new customers within the Four Properties pursuant to this Interim Order" (Doc. 151 at 3) (emphasis added), that provision does not equate to a waiver of prejudgment interest on the jury verdict, which covered *past damages*.

Coweta alleges in its response to Wagoner-5's Motion for Prejudgment Interest that the Motion is defective, in part, because Wagoner-5 failed to request prejudgment interest earlier. (Doc. 158 at 1, 3). The Tenth Circuit has interpreted Fed. R. Civ. Pro. 54(c) to allow district courts the discretion to award prejudgment interest even when such interest is not included in a party's complaint or in the pre-trial order, and Rule 54(c) itself supports such a result. *Dalal v. Alliant Techsystems, Inc.*, 1995 WL 747442, *6 (10th Cir. Dec. 18, 1995) (unpublished); Fed. R. Civ. P. 54(c).[5]

A trial court has discretion over the prejudgment interest rate to be applied. *Weber v. GE Group Life. Assur. Co.*, 541 F.3d 1002, 1016 (10th Cir. 2008). One of the rates suggested by Wagoner-5 is Oklahoma's statutory prejudgment interest rate for ERISA claims, fifteen percent (15%). (Doc. 157 at 6). That interest rate seems unreasonably high to the Court. The second

---

[5] Rule 54(c) provides: "A default judgment must not differ in kind from, or exceed in amount, what is demanded in the pleadings. Every other final judgment should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings."

suggestion by Wagoner-5 is the IRS underpayment rate set forth in 26 U.S.C. § 6621, which is equal to the federal short-term interest rate plus three percent points. (Doc. 157 at 9).

The Court, instead, chooses to apply the rate charged to Wagoner-5 for its USDA loans: 4.125%. (Doc. 157-4 at 1). This rate allows for full and fair compensation to Wagoner-5 without over-compensating Wagoner-5.  Additionally, the interest should be calculated from the date of the filing of the complaint, April 30, 2008, through the date of the final judgment which will be entered immediately following the entry of this Opinion and Order, and the interest should be compounded annually as of the end of each calendar year between 2008 and today.

Therefore, based upon the law governing prejudgment interest, the Court concludes that a final judgment should be awarded in favor of Wagoner-5 and against Coweta (City of Coweta and the Coweta Public Works Authority) in the amount of $614,798.00, plus prejudgment interest on the damage award as described above.  Furthermore, the total awarded shall accrue post-judgment interest pursuant to 28 U.S.C. § 1961.

## VI.    Conclusion

For the foregoing reasons, the Court finds in favor of plaintiff, Rural Water District No. 5 of Wagoner County, and against the defendants, City of Coweta and Coweta Public Works Authority.   Defendants' Rule 52(c) Motion for Judgment (Doc. 145), which requests judgment in defendants' favor and dismissal of plaintiff's claims for equitable relief, is **denied**.  Plaintiff's Motion for Prejudgment Interest (Doc. 157) is **granted**.  All other motions are deemed **moot**. The following relief will be awarded in a final Judgment to be entered forthwith.

### A.    Monetary Award

Wagoner-5 is entitled to a monetary award of $614,798.00 (the amount of damages found by the jury's verdict), plus prejudgment interest on the damage award in the amount of

$245,106.51, for a total of $859,904.51.  The total awarded shall accrue post-judgment interest at the rate of 0.56% per year pursuant to 28 U.S.C. § 1961.

### B.      Equitable Relief

With respect to equitable relief, the Court orders the following:

1.      Coweta shall be enjoined from limiting or curtailing the potable water service provided or made available by Wagoner-5 to the Disputed Customers.

2.      Coweta shall be enjoined from engaging in acts of competition with Wagoner-5 for potable water service provided or made available by Wagoner-5 to the Disputed Customers.

3.      Coweta shall be enjoined from furnishing, providing, or selling potable water to the Disputed Customers.  Coweta shall be prohibited from taking any action which would hinder Wagoner-5's ability to connect the Disputed Customers to Wagoner-5's water system.

4.      The injunctive relief provided against Coweta shall also apply to its officers, agents, servants, employees, and attorneys.  Coweta shall provide notice to all such persons whose employment in any way relates to Coweta's provision of potable water service.

5.      This injunction is conditioned upon Wagoner-5 remaining indebted to the USDA or on a loan guaranteed by the USDA.

6.      Coweta shall retain ownership and control over the on-site facilities, and shall continue to provide potable water service to the Disputed Customers, for one year from the date of the final resolution of this case or until such time as Wagoner-5 is ready to connect the Disputed Customers to its water system, whichever occurs earlier.

7.      At the time Wagoner-5 is prepared to make the physical connection from its own facilities to the on-site facilities serving a Disputed Customer, Coweta shall cease the delivery of potable water to the customers within that property.

8.      The parties shall coordinate in order to accomplish the transfer of the Disputed Customers to Wagoner-5's potable water system as expeditiously as possible and in a manner designed to minimize any disruption in water service to the Disputed Customers.

9.      Coweta will be entitled to receive and retain all the revenue it normally and customarily charges and receives for providing water service to a Disputed Customer, including but not limited to tap fees, meter fees, etc. charged or collected, and Coweta shall be solely responsible for maintenance and repairs of the on-site facilities until the transfer of service to Wagoner-5 is completed as to a Disputed Customer.

10.     Coweta shall take all further actions necessary to effectuate the transfer of facilities and service contemplated by this order.

11.     *This injunction shall not be effective as to a Disputed Customer until the transfer of potable water service as to that Disputed Customer is completed as described in paragraphs VI.B.6 through 9 above.*

A judgment inclusive of the foregoing will be entered forthwith.

SO ORDERED this 15th day of August, 2016.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE